(128 So. 465)

## EVERS v. STATE.

8 Div. 803.

Court of Appeals of Alabama.
May 20, 1930.

Street, Bradford & Street, of Guntersville, for appellant.

Charlie C. McCall, Atty. Gen., and Wm. P. Cobb, Asst. Atty. Gen., for the State.

RICE, J.

Appellant was indicted for the offense of murder in the first degree, tried, and convicted of the offense of murder in the second degree. His punishment was fixed at imprisonment in the penitentiary for the term of fifteen years.

He killed Norris Scarbrough, a deputy sheriff of Marshall county, by shooting him with a pistol, on May 10, 1928; the occurrence taking place in Douglas, a country, crossroads, trading point, or village, in said county.

Leading up to the killing, the testimony faintly discloses trouble between a family named Wright, living in sight of the defendant's home, the defendant living between the home of said Wright and the village of Douglas. Mrs. Wright is the sister of the deceased. It also appears faintly from the testimony that the deceased himself was active in the institution or prosecution of some cases in the county court against the defendant and his stepdaughter, one charging the defendant with having shot at the deceased's son and one charging the defendant's stepdaughter with abusive language. These two cases were set for trial in the county court at Albertville for Monday May 12, 1928.

On Friday, May 9, 1928, the defendant made a trip to Albertville, procured summonses for witnesses for the defendant and his stepdaughter in the county court cases, and there is alleged to have had a conversation with the deputy clerk, Thomason, who testified to threats by the defendant against the deceased. Thomason says he did not tell the deceased about the alleged threats. Deputy Sheriff Teal claims to have seen the defendant in Albertville on that day and that the defendant made certain remarks to him about the deceased in connection with the serving of the defendant's witnesses. Deputy Sheriff Charles Adams testified to certain remarks made by the defendant relative to the deceased when he went to arrest the defendant under the warrant charging the defendant with shooting at deceased's son, for which he was to be tried in the county court.

On the same Friday, May 9th, Lenard Evers, son of the defendant, and Floyd Douglass, a son-in-law of the defendant, made a trip to Boaz to purchase certain farming implements. Some of the evidence tends to show that on the same Friday, after the defendant had left the clerk's office at Albertville, the deceased deputy sheriff, Scarbrough, visited the clerk's office and obtained from the clerk a list showing the names of the defendant's witnesses turned in by him and also made to the clerk, Thomason, certain derogatory remarks against certain of the defendant's wit-

534

nesses, and then, on the same day, in Boaz, had some words with defendant's son and son-in-law, and threatened the defendant's son and threatened the defendant's life and charged the defendant with having been at Albertville on that day telling certain lies to the clerk, Thomason. The defendant's son, Lenard Evers, testified that he told his father, the defendant, that Scarbrough had threatened his life. Two witnesses, John Mason and Claud Brewer, testified to conversation on Friday night May 9th by the deceased at Boaz, wherein the deceased made statements in the nature of threats against the defendant, and stated that he was going to pass the defendant's home the next morning.

The state's theory, as we gather from the evidence, was that the deceased, on the morning of the killing, went from his home by the defendant's house to carry dinner to where two of his sons were working, and returned by the defendant's house, and was followed by the defendant and his son, who went to Douglas in a car in a few moments after the deceased, but without any real business calling them to the village.

The defendant's theory, gathered in the same way, is that the deceased was not really in fact passing along the road for the purpose of carrying dinner to his sons, but was engaged in matters pertaining to the prosecution of the defendant; that the witnesses he received subpœnas for from the clerk at Albertville on Friday lived along that road and in that vicinity; that the defendant and his son remained at home at work until after dinner, working on a car top, and went to Douglas after dinner to get thread and a tire vulcanized; that, instead of the defendant following the deceased, the deceased hunted up the defendant, and, after a conversation with one Moon, out in the street, attacked the defendant with a pistol, the defendant fleeing around a mule and being followed by the deceased; that a shooting scrape resulted in which the deceased deputy sheriff was slain.

State's witness testified that the deceased accused the defendant of having a pistol and stated that he was going to arrest the defendant and that this led on to the killing.

The defendant pleaded self-defense. He relied upon the statute with reference to carrying a pistol, that he had been threatened and had reason to apprehend an attack. He denied that deceased said anything about arresting him; he claimed that he was suddenly attacked by the deceased with a deadly weapon really relieving him of the duty of retreat, and that, although he did manage to dodge behind a mule in an effort to escape, the deceased followed him around the mule, which made his escape by further retreat perilous and shooting of the deceased necessary self-defense.

What we have set out above, while scant, perhaps will, we think, serve to illustrate the few rulings we shall make. It shows, or is intended to show, that the evidence in the record leaves no room to doubt that hostility of a rather vicious sort—in fact, as events developed, of a deadly sort—existed between defendant and deceased. Whether defendant "followed" deceased to Douglas, on the tragic occasion, in the sense of "trouble hunting," as was plainly sought to be shown by the state's evidence, or whether defendant was casually or incidentally or on legitimate business in Douglas at the time, became, under the circumstances, a very important fact.

State's witness Dr. Lindsey, whose testimony was very damaging to appellant, and who was shown to be a physician with an office there in Douglas, etc., was allowed to state, over appellant's timely objection, and proper exception, that, prior to the day of the fatal difficulty between deceased and appellant, he (witness Dr. Lindsey) had not seen appellant in or about Douglas for "seven or eight months." Perhaps we are expressing ourselves none too well, but, from a careful study of the whole record, we are convinced, and hold, that the court erred to the prejudice of appellant in allowing this testimony. Doubtless the learned trial court considered it wholly immaterial and entirely unimportant. But, while agreeing that it was immaterial, utterly, because appellant, under the evidence, could have been in Douglas many times without witness having seen him, from a survey of the whole situation we are of the opinion that said testimony very probably worked to the serious prejudice of the appellant. We think it is commonly known that a physician located in a small "crossroads" village—a "country doctor," as such an one is everywhere called—is, unless special circumstances are shown tending to the contrary (and there were none such in this case) always a man of more than average influence; and, in such a case as is here presented, and under the surroundings here shown, it is easy to see how, though the testimony mentioned was altogether immaterial, it might have been, and very probably was, very persuasive with the jury trying the case, to the effect that the occasion of this rencountre by the defendant with the deceased was the *first* time within seven or eight months that defendant (appellant) had *been* in Douglas. And from this strength unjustly might have been given to the state's theory of this killing, that defendant (appellant) had "followed" deceased there for the purpose of getting into a fight with and killing him.

Not only do we have some doubt, under the evidence shown, as to whether or not the deceased was justified, as a matter of law, in undertaking to arrest appellant without a warrant, as for the commission of a misdemeanor in the presence of deceased, as, under the law, he might properly do, but we are of the opinion, and hold, that, the testimony

given, even by the state's witnesses, as to the badgering, belligerent, and threatening manner of approach, or accosting, by the deceased to, and of, the appellant, upon the occasion of the beginning of the fatal difficulty, indicated conclusively that his purpose was *not* to make a lawful arrest, and robbed him of any right to the protection of the law as of an officer engaged in making such an arrest, and that hence the objections to the questions calling for the information that deceased was a deputy sheriff, in this connection, were improperly overruled. In other words, after a careful study of the evidence in the record, we think it clearly appears that deceased was, so far as the difficulty in which he lost his life is concerned, the aggressor, without the immunity afforded by law to one engaged, bona fide, in an effort to make a lawful arrest, and that hence testimony that he was a deputy sheriff was immaterial and naturally harmful.

Under the testimony here shown, appellant was entitled to have his plea of self-defense, and the testimony in support thereof, weighed by the jury in the light of instructions as to the law on that subject subsisting when two men, neither of them clothed with any sort of legal immunity, meet, fight, and one of them is killed. Of course, it may be that, in developing the testimony tending to show motive, threats, etc. it will become impossible to keep out of the evidence the information that deceased was a deputy sheriff of the county. But, if so, the jury should be instructed specifically that, under the facts here shown, *such* information should not weigh against appellant in the consideration of this case.

For the errors we have indicated, it will be necessary to reverse the judgment of conviction and remand the cause. We deem it not worth while to treat the other large number of exceptions shown. Most if not all of them involve rulings of small consequence. In the main they appear to be free of error. At any rate, we do not anticipate that, on another trial, the questions will arise in the same way; hence what we might say would be of no benefit.

Reversed and remanded.